Appley, and the people of the state of Illinois, Appley. Good morning, Council. Can everybody hear me okay? Yes, Your Honor. Yes, Your Honor. Yes. Thank you. Apologize for a little bit of delay. We're having all kinds of technical difficulties this morning. But I do want to start by saying thank you to all of the Yes, Your Honor. Thank you. And may it please the Court, Clifford Berlow on behalf of the Northern Illinois Gas Company. In this case, the Illinois Commerce Commission denied recovery for $32 million worth of investments that NICOR made to improve the reliability and safety of its system. Now, everybody agrees in this case that every one of the projects that we've described in our brief is what's known as a qualified infrastructure plant project, meaning it has a specific safety and reliability purpose. And that's important because the Illinois General Assembly created a statute designed specifically to deal with this kind of a project. And what it said is that it wants utilities to be proactive, to be forward, to be thoughtful, and to engage in doing these safety and reliability projects affirmatively. And the promise is that on the back end, the review from the Illinois Commerce Commission is going to be one simply for prudence. Now, prudence doesn't mean perfection. Prudence doesn't mean optimal. Prudence doesn't mean ideal. And prudence certainly doesn't mean that you should do what the Illinois Commerce Commission would have done if it was making the decisions. Prudence allows for a range of options. It is a reasonableness standard. It is the business judgment rule. It is a rational basis standard, if you want to think of it in terms of constitutional law. This is a very familiar concept through the law. And our fundamental submission to the court today is that with respect to the various projects and cost disallowances that were made in this case, that the Illinois Commerce Commission has fundamentally failed to apply the prudence standard as set forth by precedent and as set forth by common sense. Now, we've obviously identified in our brief a number of different projects. I obviously want to talk about whichever projects are of greatest interest to the court and whichever ones that you have the greatest concerns or interest in. Intuitively, I'm inclined to start with Phase 7B of the Auxable pipeline replacement, both because it's the most sizable single disallowance. And I think it's the one that really crystallizes the way in which the Illinois Commerce Commission dispensed with the appropriate prudence standard. Mr. Berlo, I appreciate you asking for our comment here. So the premise is that this is an urgent project. It has to be done. What in the record supports that? Justice Petal, your voice isn't coming through very well. Mr. Berlo, can you hear me? Yes, I can hear you, Your Honor. Thank you. I apologize, my rather large head coming close to the screen, but I want to make sure you hear me here. The assumption is this pipeline needs to be addressed quickly. I don't believe that your opponents believe that that is necessarily the case. Am I wrong about that? I think you're wrong about what they believe here. And let's go back and look at this from a little bit more of a big picture standpoint. The Auxable pipeline is one of the most critical pieces of infrastructure that exists in the state of Illinois. It brings natural gas to the west side and northwest side of Chicago. And I think it's probably worth mentioning that natural gas is the primary way in which people get heat into their homes. So it's a pretty substantial and important project. There was a known safety risk with respect to this project. It was identified for the first time in 2004, 2009, 2013. And it was the same safety risk that led to a really catastrophic event in California that resulted in the loss of life. So I don't actually understand the commission to be taking the view, certainly not based upon anything you see in the actual opinion itself, which consists of a single paragraph that appears in Appendix 92, questioning that this was a safety project, questioning that this was an important safety project, and questioning that it needed to be done. And indeed, I'll point out that this was Phase 7B of an eight-phase project. There's never been any question about the need to perform this work at Phase 1, Phase 2, Phase 3, Phase 4, Phase 5, Phase 6, Phase 7A, or in the same order that exists here, Phase 8. So I don't actually understand them to be questioning that this was work that needed to be done. I think the question here is actually significantly narrower than that. And let's just look at what they say on Appendix 92 about why they disallowed the cost. I think that's the appropriate place to start with any administrative decision, which is what did the agency actually say? And what the agency said here fundamentally are two things. First, they said that NICOR trespassed on a railroad's property and that that somehow inflated costs. That's a finding that the commission made. And what's interesting is that the commission and the attorney general do not bother to defend that finding at all anywhere in their briefs. Why don't they defend it? Because it's indefensible. There's no evidence to support that. What the record shows is that property rights were respected, and there certainly is no evidence to suggest that the failure to respect those rights increased costs. So just from the start, you have a completely erroneous finding at the heart of the commission's analysis. I would suggest that that infects the entire reasoning, and so the decision simply can't stand on that basis. But then you have a second point that's made, and it's this, that roughly a year after this work was performed, there was a resolution of the dispute that existed between NICOR and the railroad and that the real basis for the increased costs, Justice Hedl, was that you had to work around the railroad's property because the railroad was refusing the right of way. And the problem with that is that I think even the commission admits this. If any weight, even the slightest weight, is given to the fact that we now know that there was a resolution and that it could have been cheaper, that is an inappropriate hindsight analysis that's not appropriate for a prudence review. So the fact that what ends up in the decision is, hey, if you had waited, we would have saved $14 million, is pretty clear evidence that the commission was giving weight to something it can't give weight to. And Justice Hedl, I do think in their briefs, both the attorney general and the commission offer a third reason that really doesn't appear anywhere in the 10 sentences of analysis that the commission applied in disallowing these costs. What they say was, well, this is work that needed to be done. We understand that, that we don't dispute that there is an importance to doing this. But you could have waited a few years and maybe saved. Right. And waited a few years and maybe saved $14 million. Now, first, if they're saying that with any level of certainty, you have to look at this, though, from the point of view of NICOR at the time. We had no way of knowing that any resolution was ever going to happen. And I can't begin to overstate how contentious the dispute with the railroad is. I would suggest that that sort of reasoning is just hindsight analysis. It's saying we know you would have saved $14 million. How can we not be allowed to consider that? I would strongly suggest that if you're saying, well, we could wait a little bit and see what the suppressed premise here is. Hey, and we know what happened. That's the first part. The second part is understand what they're really saying here. What they're really saying here is that there is a bright line rule that exists in the prudence inquiry that they believe the court should adopt. And it's this. It is per se imprudent to address a known safety or reliability risk unless disaster is imminent. That rule is not prudence. The question is, would a reasonable company in NICOR's position proactively move to address a known safety risk? Not is it something the commission would have wanted it to do, not as if they had been consulted, not as not as it's something that would be ideally efficient in the view of the attorney general. The question is, could a reasonable company that is concerned with protecting the public. And protecting the reliability of its system, do the work that it did, and the answer plainly is yes. The idea that we're going to adopt this per se standard of imminence is the only circumstance in which you can act if there's some prospect of it being done more cheaply in the future. I would suggest substitutes the commission's judgment for the utilities judgment. And that's improper. The case law pretty clearly says it's improper. So I think that when you look at this alternative rationale that the commission is offering to the extent you want to give it any weight, given that it turns on a finding that's not actually in the commission's order. And by the way, commission was fully aware of this argument. They summarize it in describing what the attorney general's position is. And they thought so much of it as to not include it in its explanation for why it is that it was why it was rejecting these costs. With respect to this, the attorney general doesn't actually put evidence in the record, if you look at it, to say there was no imminent risk. If you look at E-713, E-1091, all you have is the attorney general's witness saying, well, NICOR hasn't proved that there was an imminent risk. They're treating it as an element. They are treating it as a per se requirement. And that's improper, because I would submit that the entire reason for having this QIP program is to encourage utilities to not wait till we're on the eve of disaster. Instead, what they want them to do is to go out and fix the problem and fix it now. So I think with respect to 7B, if you get beyond the reasons given in the opinion and you get to this alternative rationale, my submission to the court is what they're offering you is a rule that they're asking you to issue a decision that would stand for a terrible rule that will, I think, chill utilities' willingness to stop problems before they arise. And that's something that we shouldn't do. Pipeline safety is not an area in which we want utilities cutting corners. And that's what the Illinois Commerce Commission seems to be saying. Money is more valuable than risk. So I think that's really the point with respect to 7B. If it makes sense, Your Honor, unless you have further questions about 7B, I think to transition ever so slightly to, I think there's a group of projects we can kind of talk about all at once. And those would be Ancona, Troy Grove Sand, Sycamore Station, and Arlington Heights. And just at the outset, they all have the same, I think, similarly indefensible problem. The commission found imprudence, no question. But the problem is that the commission disallowed the entirety of the cost overrun, even though the evidence in the record was that the act of imprudence only caused a part of the overrun. And let's just talk about Ancona because the most dramatic example in some respects, but this is true across the board for these. For Ancona, the commission had evidence in its hand saying that the failure to have complete and comprehensive records resulted in at most $650,000 in cost overruns. Here's the problem with that. They then turned around and said, and therefore we are going to disallow $2.38 million in costs. There needs to be a nexus between what the evidence shows about what the imprudence caused and the disallowance. And what's notable. I think that's probably the appropriate remedy here, Your Honor. I mean, I think you could issue, you could remand with directions and instructions in this case, because there is no, there's no evidence contradicting this $650,000 versus $2.38 million. And they have the same issue with respect to Troy Grove, where I think it's a little over a half million dollars. The evidence shows $172,000 was attributable to the imprudence. You have a similar issue, you have a similar issue with Arlington Heights, where you have 10%. I think Sycamore Station may be in a little bit of a different posture because the, and I, but I do think it's telling here. What they said about Sycamore Station is we affirmatively acknowledge that the imprudence we found related to record keeping caused only a fraction of the $240,000 in cost overruns. But we're going to disallow all of it because we don't have a basis in the record to disaggregate the way in which, what part of, what slice of this was attributable to the records issue. So, that should be revealing. The commission knows it needs to do this. It knows how to recognize that evidence and how to say it. And then when it has the evidence in its hot little hand, it decides to ignore it. And it did it time over time over time. That's a problem. That's pretty indicative of a commission that knows that it's just trying to reduce the overall cost at any cost. In point of fact, though, and I do want to make this point. We don't think that NICOR acted imprudently at all with respect to these record keeping issues. And I think that probably it's helpful to understand a little bit of the context. All of these facilities went into service in the 1950s and the 1960s. At that time, the way in which you would record records of plant, and the records exist, they're just not as accurate as the commission would like. You had people in the field using a number two pencil, a pad of paper, and a ruler measuring out and marking where these things are. What the commission seems to be faulting NICOR for is not having records that measure up to the standards you would have using computers, GPS satellites, and laser guided measurements. I would suggest to the court that what they're doing is imposing a modern standard of record keeping in place of what the actual standard is. Yes, I know I'm out of time. If you have questions about phase eight or the other issues or anything else, I'm happy to address them on rebuttal. Thank you, Your Honor. Justice Peterson, any questions? No. Justice Albright. All right, you'll have time on rebuttal. Thank you, Your Honor. Mr. Dobbs, I believe you're next. Yes, Your Honors. May it please the court. Good morning, Your Honors. My name is Brian Dobbs. I'm Special Assistant Attorney General appearing on behalf of the Illinois Commerce Commission in this matter. Counsel for the Attorney General's Office, Mr. Chris Turner, and I will be dividing our time eight minutes to seven. And with my time, I'll address the first three issues raised by NICOR on appeal, roughly the first half of what Mr. Brillo was talking about. The remaining four issues will be addressed by Mr. Turner with his time. And, of course, should Your Honors have any questions, I'm happy to answer them as best I can. Now, before getting into the specific disallowance categories, I just want to make a couple of general remarks. This was a reconciliation proceeding under 9201 and 9220.3 of the Public Utilities Act. This is a very familiar prudence review proceeding that the Commission engages in over the decades. And 921C is very clear. The burden of proof in this and other rate-making proceedings falls on the utility and stays on the utility to prove its case in chief and show that costs were prudently incurred and that they're just and reasonable to flow to customers. And, in fact, the Illinois Supreme Court has clarified that and emphasized it in business and professional people versus the public interest versus the ICC in 1991. And in that decision, they also emphasized that when the Commission is presiding over this type of proceeding, it is not acting as some neutral arbiter or fact finder like a contested case. This is a rate proceeding where it is bringing its expertise to bear. It is investigating the proofs that the utility is submitting. That's the Commission's job, and that's what they did here with each of these seven categories of disallowances. In total, NICOR sought 414 million, spread over 213 projects, and ultimately was permitted. It was allowed for QIP recovery in 92% of those. So we're talking about less than 8% disallowed here. Turning to the first category, the one that Mr. Brill has spent the majority of his time, the OSABO Phase B project was part of the OSABO pipeline. This is a 34-mile pipeline, and we agree, a very important pipeline for NICOR's system. A 36-inch pipe running to the west and southwest of Chicagoland area. In the 7B portion, so NICOR elected to break this pipeline replacement project up into multiple phases. This was their choice and their decision to manage. In the 7B portion, we're talking about a 2-mile stretch with work to be completed in 2019. Unfortunately, in June of 2017, a railroad derailed at the OSABO site, and this prompted a right-of-way dispute that stretched for several years. As Council pointed out, it was quite contentious, both in Circuit Court and I believe there was a preceding investigation at the Commission level. It was very contentious. Ultimately, rather than resolve the right-of-way dispute, what the utility elected to do was put together a $14.2 million workaround, which it just presumed that the Commission would rubber stamp. This consisted of installation of three stopples, some pressure testing, and a caliper run, which its vendor, Precision Pipeline, conducted. This was a very expensive workaround. Ultimately, what NICOR brought to the Commission as part of its petition were barely cursory and summary claims of safety risks related to the pipeline as a whole. As Council noted, these were inspections that occurred in 2004, 2009, and I think 2013 or 2014. But there was no evidence in the record showing desponding or bailing corrosion protection or anomalies in the pipeline specific to Phase 7b to justify this price tag. And that's the Commission's job, to make a prudence review weighing the costs foisted onto ratepayers versus the utility's interest in recovering its expenses. That's our job here. And contrary to the two arguments Mr. Berlow made, there was no hindsight review here conducted. And in fact, the argument that you just heard shows just how myopic NICOR is asking this court to be. In fact, the utility would like you to focus on two paragraphs in a 111-page single-space order, and in particular, ignore the nine pages of analysis and weighing of the evidence that preceded it. The problem is, when you look at that, I think it's Appendix 92, it's 86 in the order. When you look at the top of 86, the first full paragraph, the Commission says, the Commission agrees with the Attorney General. And what is it agreeing with? Its summary and the analysis of the Attorney General's argument that it analyzed over three pages before. And I'll just quote the last summary of that argument, which it incorporated and credited. NICOR gas, this is page 85 in the order, NICOR gas did not identify any immediate or near-term threat to the existing section of the pipeline, nor did it provide any other evidence of any significant incremental risk to the public that would have resulted if NICOR had delayed construction. So in other words, rather than focusing on these two narrow paragraphs, look outside to the entire Commission order. And in fact, there's case law for this proposition. We didn't get a chance to cite it in our place because this argument was raised in reply. But in Ameren v. ICC, 2015, ill at 4th 140173, at paragraph 82 in that decision, the 4th District of Illinois Appellate Court was very clear that when the ICC diligently summarizes a party's argument and weighs the evidence, and then incorporates that in a conclusion paragraph, it has made findings sufficient for review. This is not just 10 sentences, as counsel insists. Rather, this is a robust, fact-intensive review, and no hindsight analysis occurred here. The problem is, counsel's argument is essentially that the Commission was telling NICOR, you should have waited precisely one year when you would have resolved the right way. But that only makes sense if you put words in the Commission's mouth. The Commission did not say that. The Commission said, given the cursory and summary safety allegations, your $14.2 million price tag was not justified as prudent and reasonable. End of discussion. You should have waited. This was not an imminent risk. This was not an incremental risk. And to the contrary of Mr. Briller, we're not arguing for any kind of per se rule. There is no per se rule in the Commission's order. This isn't us putting money over safety. There was no evidence of a significantly incrementally increased safety risk. That is a red herring, and so is the trespass argument. Frankly, the trespass language is incidental to what the Commission ultimately held. It wasn't a central premise. Ultimately, the Commission held you didn't prove your case, and the burden remains on the utility to do that. Just briefly turning to some of the other categories of disallowances. The OSABO Phase 8 was an 1,100-foot stretch of pipeline with two adjacent facilities that saw a $3.3 million cost overage. That was a 40% increase from the utility's own projected cost in April of 2019. So when they brought that petition to us, we naturally, as an investigator, as a rate maker, said, where's your justification? We have record evidence from Sebastian Coppola, both on OSABO Phase 7 and Phase 8. This is E1093-94 in his rebuttal in E709. There was record evidence probing some of the conclusory safety allegations, and come to find out, NYCWRD didn't even bid this project out. Precision Pipeline was granted a no-bid contract. I see my time has run out. May I finish my sentence? Please. Okay. Precision Pipeline was granted a no-bid contract after it had worked on Phase 7B, and with that awarded dewatering service to its affiliate company, driving up the price of this. The commission ultimately held this was not a prudent decision, and substantial evidence supports the disallowance of those costs for all 70 of these projects. Thank you. Thank you, counsel. I'll let the judges chime in if they have any questions. Otherwise, we'll move on to Mr. Turner. Justice Peterson? No question. Justice Albra? All right. Mr. Turner? Thank you, Your Honor. Good morning, Your Honor's counsel. May it please the court. I am Christopher Turner, the Assistant Attorney General representing the respondent, the Attorney General of Illinois in this matter. Now, because the commission had started off with the first three projects, I was going to initially start addressing the final four Group 1 projects, including the Anacona project that my opposing counsel referred to. But, of course, if the court has any questions on any of the projects, I'll be happy to answer them. I'd like to start off, though, just reiterating what my co-respondent said. I mean, there is no per se rule being argued by either the Attorney General or the commission here. It is really actually only at NICOR which is seeking per se rules. What we've got here is, in every single one of these cases, evidence on both sides was submitted to the commission, and the commission weighed that evidence and decided to credit one side of testimony over the other. That is what each of these rulings are. And we do not argue, nor does the commission argue, that the commission was unable to make a decision on the other side. It is NICOR that's telling the court this. It is NICOR that's saying that if we put forward a safety issue relating to the QIP project, that, therefore, the commission, its hands are tied, and it cannot make a decision against us and find any of those safety expenses imprudent. Now, turning to Anacona, these Group 1 projects, and Anacona in particular is the largest of them, the commission had found that, and NICOR has not challenged an appeal, it found that NICOR was imprudent by failing to maintain accurate records of its own equipment on its property. That's not being challenged here, and this appeal wasn't challenged in the briefs. Arlington Heights had similarly found that they failed to coordinate with the local village and the local businesses in the project. The only arguments to make in their brief actually go to really a causation question. With regards to Anacona, they want to say that it would have been the same cost anyway. And with regard to the other, actually all four of the projects, they want to say that a portion of their cost overruns were attributed to some other factor than the imprudence that the commission found. But, in fact, the commission was not required to credit, for all these cases and all these issues with them, a one-sentence perfunctory assertion made by their witness Whiteside in his surrebuttal testimony, so basically getting the last word. And when they had evidence on the other side, the testimony by the Attorney General's witness, Coppola, that, in fact, all of the cost overruns were attributable to the imprudent conduct. Now, with regard to Anacona— The point about the argument that they're disallowing the entire project, even though the cost overrun associated with the buried pipes not keeping records, running into things that they should have known about, was only a portion. What's your response to that? Well, in fact, it wasn't the entire project, right? This is only the cost overruns that were being disallowed. And my response is they did have testimony on their side that these cost overruns, that the additional work that was being done was fully attributed to the imprudent conduct. The commission specifically rejected the argument that the cost would have been the same anyway. Coppola had testified that they wouldn't have been the same anyway. He said that the cost would cause the $1.8 million, which is actually all that they tried to attribute to other factors, that all those costs were actually attributed to the imprudent conduct. And when he did it, as Coppola explained his testimony we cited to earlier at E679-680, he said that no, just because you have imprudent conduct and then you end up having to later on, on the site, redesign the project, then go and bring new labor and materials, you wouldn't have had the same costs anyway. There's no reason to believe that on the fly in that situation, that all the cost overruns would have just been the same. And they provided no evidence, again, other than this single sentence, as all the white side said, if you look at his testimony, the cost would have been the same anyway. They were not required to credit that statement. With regard to Troy Grove, when they tried to make the same argument, you can see on the next page of the commission's order, on page 45 of the order, they explained for a full paragraph why that's an unreasonable assumption. That even NICOR itself, when it was discussing the projects, realized there were move-on costs, extra costs involved with going on to a project when you're trying to make changes in the field. And so it was their burden, as the commission points out, and it was always their burden to prove the prudence of their costs. The same thing goes with the other contributing factors, Your Honor. They had a single sentence in reservable testimony that just said that the imprudent conduct was only attributable to $650,000. But they didn't provide any explanation of that. And Coppola, actually, if you look at his testimony, he looked at their discovery responses, and he said that all $1.8 million was attributable to the imprudent conduct. And actually, his testimony didn't even match with the discovery responses. He claimed it was one of four factors when the discovery response has five factors. And also, it actually only accounts for $1.8 million when the disallowance is $2.4 million. So there's a whole $600,000 not even accounted for entirely. So with this mismatch, with in general, the commission is not required to accept every one-sentence assertion, especially when they have evidence on the other side. They can weigh that evidence. It is their job as the experts, as the investigatory body, to ensure the prudence of those costs. Sorry, I'll make sure of time. And just to go back briefly, unless the court has any questions on those projects, with regard to the Group 2 projects, which I'm sure my opponent will talk about, it is NICOR there that thrives in direct violation of both the statute and Supreme Court authority to shift the burden of proof, that is the burden of persuasion, off the utility to the other parties and effectively to the commission to prove the imprudence of its costs. There is no case law that supports such a radical change and would directly violate the BPI versus ICC case that we all cite, and actually all the other Supreme Court cases that have addressed the matter, where they make clear that the burden of proof is always on the utility to prove the prudence and reasonableness of its costs throughout the rate-making proceedings. With regard, then, to the 7B project as well, Your Honor, just again, there's no per se rule that we're arguing for. Just like with the Anaconda, with the other projects, there was substantial evidence on both sides. The commission could have come out the other way, but they're the experts. They know they have had a lot of experience now with the All-Sable project, and there was no question there where they were trying to claim that, no, you have to have a, like, that the project was going to go apart. What they didn't have was the evidence showing that there was any imminent risk, anything changed about Phase B, 7B, or the pipeline in general that required that immediate workaround, and that they couldn't delay and continue to try to resolve the issue with the railroad before making the $14 million investment. Thank you, Mr. Chairman. I didn't see if I was out of time. Sorry about that. You are. Any questions? All right. Mr. Berlow, your response. Your Honor, let's just begin here with the points made regarding Phase 7B quickly. Fundamentally, let's just start with the premise here, which is it doesn't mean you're imprudent if you act before a problem is imminent. That's not what prudence means. And what I think is striking about the Attorney General's argument is that the central attack here on this was they didn't prove it was imminent. That's exactly what Mr. Turner said. And my submission to the court is that they're asking that that be an implied requirement of establishing prudence. My submission to you today is that a reasonable company exercising ordinary business judgment that is not just in it for themselves, that is acting for the public good, can address a known safety problem without waiting for us to be on the eve of a major, major, major problem. That's the fundamental point we're making. Now, Mr. Dodd said that NICOR chose to develop this workaround and said, and I think his exact words were, rather than resolve the right-of-way dispute. Doesn't that sort of impliedly suggest that he knows that there's a resolution coming? That is hindsight analysis. That's the whole problem. It isn't as though NICOR wasn't trying to resolve its dispute with the railroad. It wasn't as though it wasn't making the effort. But at the time, it had to decide whether it was time to go and fix this. It didn't know if they were going to get there. There is also this question raised about whether what the evidence shows about safety. Let's look at what's in the record. Mr. Whiteside testified, and you can see this in Appendix 81, that the Auxable pipeline as a whole was considered the highest-risk asset in the company's system. There's very clear, and there's nothing too distinct. The argument here that we needed to go phase by phase and demonstrate, oh, this problem is worse here or better here or go section by section, no. It's the same problem for the entire pipeline. It's the same coding that's deteriorating throughout. And the rate at which this is going is not going to be, just as a matter of physics, any different depending on these different sections. So this idea – and frankly, if we had gone about the – and tried to make an effort to section by section confirm that each section was exactly the same with the time-intensive and expensive studies that that would have required, I can tell you right now that the Illinois Commerce Commission would have said, that's just wasted resources. We're not going to allow you to recover it. That's just a catch-22. Looking then at I think where I sort of left off, which was phase eight, and accounts for the Commerce Commission addressed this, I pointed out that these record-keeping arguments really don't go anywhere because what they're doing is applying effectively a modern standard for how exact, how precise a record needs to be made to records that were made in the 1950s and the 1960s. That's just hindsight review. The question is, were the records prudently made given the circumstances that exist in the 1950s and the 1960s? And there's no suggestion otherwise anywhere in the record. The alternative argument that the commission has put forward is that this project should have been competitively bid. And the problem for the commission is that we provided an explanation for why we didn't do that competitive bidding. One was safety. It was not going to be safe in such close quarters having two different contractors working side by side. No evidence in the record to rebut that. Second was timing. It takes months to do a competitive bidding, and this was a time-sensitive project. The commission made that finding as well, that this was time-sensitive. Now, the attorney general's answer for this is, well, back when you bid phase six and phase seven and phase seven, you should have also bid phase eight. Well, that's just hindsight analysis because we now know that there was going to have to be this workaround, which would create this geography crunch, and that was going to create the problem that we're talking about. So all of this should have been bid at once based on what we know now. That's not appropriate for a prudence review. So I would submit to your honors that phase eight sits basically in the same spot as Encona and the rest, at least with respect to the record-keeping argument, and that this competitive bidding point really doesn't go anywhere. The last point I want to make is this, and it's sort of a fundamental administrative law rule that we have here. You've heard both the attorney general and the commission say that the commission wasn't required to accept evidence. And I'm not saying the commission's required to accept evidence. I do think when it's unrebutted, though, it needs to have an explanation to the court so it can engage in meaningful appellate review for why it is taking the positions it's taking. The case that Mr. Dodge referenced, there's a fundamental difference here in the Ameren case. That decision, this is the quote, diligently summarized the arguments and chose to formally adopt the arguments made. That didn't happen here. If anything, the opposite is true. Thank you, Mr. Berlo. Your time is up. Questions from the panel? I'm done. Mrs. Albrecht? No. No questions. I think I'm going to hold off on my questions also. Thank you very much for this spirited and very interesting argument you brought to us. The clerk is going to escort you out of the virtual courtroom, and we will issue a written decision here in hopefully the near future.